## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT NOSSE,

     Plaintiff,                                    Case No.

v.                                                        Hon.

CITY OF ANN ARBOR, MICHIGAN;

GLEN A. DEMPSEY, in his individual
Capacity and in his official capacity;

CHRISTOPHER MCFARLAND, in his
individual capacity and in his official
capacity;

LISHA TURNER-TOLBERT, in her
individual capacity and in her official
capacity;

RITA FULTON, in her
individual capacity and in her official
capacity;

DEREK DELACOURT, in his
individual capacity and in his official
capacity;

and BRANDON BOGGS, in his
individual capacity and in his official
capacity;

     Defendants.

_____

Samuel Estenson (P82414)
DeLoof, Dever, Eby, Milliman & Issa, PLLC
301 N. Main St., Second Floor

Ann Arbor, MI 48104
(734) 994-1295
sle@deloofdevereby.com

Charlotte Croson (P56589)
Croson, Taub, & Michaels PLLC
455 E. Eisenhower Pkwy Ste 75
Ann Arbor, MI 48108-3335
734-519-0872
ccroson@ctmlawyers.com

_____

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff ROBERT NOSSE, by and through his attorneys,
DeLoof, Dever, Eby, Milliman & Issa, PLLC and Croson, Taub, & Michaels,
PLLC, and for his complaint hereby alleges as follows:

## INTRODUCTION

1.      This is an action brought pursuant to 42 U.S.C. §1983 and the Michigan
Constitution for declaratory judgment, preliminary and permanent injunction, actual
and nominal damages, and other relief arising from the unconstitutional policies,
practices, and threats of Defendants City of Ann Arbor, Glen Dempsey, Christopher
MacFarland, Lisha Turner-Talbot, Rita Fulton, Derek Delacourt, and Brandon
Boggs. Defendants' policies, practices, and conduct threaten Plaintiff with
irreparable harm to his rights under the Fourth, Fifth, and Fourteenth Amendments
to the United States Constitution and violate his rights subject to the First
Amendment to the United States Constitution and Art. 8 § 31 of the Michigan

Constitution. The harm may only be remedied by a ruling from this Court.

2.      Defendants have impeded and threaten to further unconstitutionally impede Plaintiff in his right to be free from unlimited warrantless searches without probable cause by maintaining, implementing and enforcing vague policies that (i) threaten Plaintiff and others with subjection to unduly broad warrantless searches of their houses without probable cause; (ii) violates Plaintiff's reasonable expectation of privacy; and (iii) retaliate against Plaintiff for exercising his Fourth Amendment rights by either (a) pressing criminal charges against him, or (b) depriving him of his property rights, including but not limited to the right to use his private property by renting it to others.

3.      As a result of the policies, practices, and customs of the Defendants, as well as certain conduct by one or more Defendants, Plaintiff will suffer irreparable harm unless the Defendants are immediately enjoined from restricting his Fourth Amendment rights in this manner.

4.      For the reasons above, Plaintiff seeks, amongst other things, declaratory judgment and injunctive relief determining that 1) the offending provisions of the City's Housing Code, codified in Chapter 105 of The City of Ann Arbor Code of Ordinances (hereinafter "The Code") (**Ex. 1**), are unconstitutional on their face and as applied to him, 2) that the Code is insufficient to support the issuance of an "administrative" warrant without probable cause, and 3) in the alternative that his

homes are exempt from the offending provisions of the Code due to their status as "owner-occupied" "single-family" "dwellings" as those terms are defined in the Code.

## PARTIES

5.    The Plaintiff is a property owner in the City of Ann Arbor. He owns two homes, located at 1421 West Huron Street (the "Huron Street home") and 1309 South Seventh Street (the "Seventh Street home").

6.    Defendant City of Ann Arbor (or the "City") is a municipal corporation located within Washtenaw County, Michigan; it is created and existing under and by virtue of the laws of the State of Michigan. In fulfilling its duties, the City acts by and through various commissions and public officials, including without limitation Building Department officials and Code Compliance officials.

7.    Defendant Glen Dempsey is the current Building Official for the City of Ann Arbor.

8.    Defendant Christopher MacFarland is the current Code Compliance Official for the City  Ann Arbor.

9.    Defendant Lisha Turner-Talbot is the current Building and Rental Services Manager for the City of Ann Arbor.

10.    Defendant Rita Fulton is a former Housing Inspector for the City of Ann Arbor.

11.     Defendant Derek Delacourt is the current Community Services Area Administrator of the City of Ann Arbor.

12.     Defendant Brandon Boggs is a former Housing Inspector for the City of Ann Arbor.

13.     Defendants Glen Dempsey, Christopher MacFarland, Lisha Turner-Talbot, Rita Fulton, Derek Delacourt and Brandon Boggs are also, all together, referred to as the "individual Defendants".

14.     The individual Defendants, as part of their official duties and responsibilities with the City of Ann Arbor, implement or implemented the Code and/or enforce or enforced the unconstitutional restrictions accomplished through the City's policies and practices (as described herein).

15.     The individual Defendants are individuals who undertook specific action so as to deprive and/or violate the constitutional rights of Plaintiff and did so in their individual capacities, as part of their official duties and responsibilities as employees and/or agents of the City of Ann Arbor, and in their official capacity of adopting and implementing a policy, practice or custom of the City of Ann Arbor.

16.     Defendants have threatened Plaintiff with harm up to and including criminal charges as a consequence to any attempt to assert a constitutional right to be free from unreasonable searches of his houses.

17.     All actions by the individual Defendants described herein were

undertaken under color of state law which caused the deprivation of Plaintiff's rights protected by the United States Constitution.

18.     All acts herein of the Defendant City of Ann Arbor, its officers, agents, servants, employees or persons acting at their behest or direction, were done and are continuing to be done under the color or pretense of state law.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action arises under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to prevent imminent deprivations, under color of state law, of rights, privileges and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil and constitutional rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; under 28 U.S.C. § 2202, to secure preliminary and injunctive relief and damages; and under 42 U.S.C. § 1988 to grant Plaintiffs' prayer for relief regarding the recovery of costs, including damages, restitution, and reasonable attorney fees.

20.     The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. The pendent claims are part of the same case

or controversy. They do not substantially predominate. They do not raise novel or complex issues. Therefore, exercise of jurisdiction is proper.

21.    Venue is proper within this judicial district and division pursuant to 28 U.S.C. § 1391(b) as (i) Defendants are situated within this judicial district and division, (ii) the Defendants transact business within this District, and (iii) the conduct complained of occurred within this District.

## FACTUAL ALLEGATIONS

22.    Plaintiff owns and occupies two homes within the City of Limits of Ann Arbor, Michigan, each of which has been subjected at one time or another to various enforcement actions brought by the City based upon provisions of the Code.

23.    As described in greater detail below, within months of Plaintiff's first becoming an Ann Arbor home owner, the City began to exert its overzealous and unconstitutional Code enforcement regime on Plaintiff, demanding he agree to a government inspection of his property or face civil and/or criminal penalties.

24.    Plaintiff has never voluntarily and knowingly consented to the Code inspections.

25.    Each inspection of plaintiff's property was coerced through the implied threat of loss of property or liberty; and plaintiff continues to be coerced into providing involuntary consent to such inspections.

### The Unconstitutional provisions of the City's Housing Code

26.     The Code mandates that the City "Building Official shall inspect all dwelling units" in Ann Arbor, §8:511(1)(a), defining a dwelling as "[a]ny building which is wholly or partly used or is intended to be used as habitable space by human occupant," and a dwelling unit as "[a]ny room or contiguous group of rooms located within a building and forming a single habitable unit with eating, living, and sleeping areas, a kitchen, and a bathroom for 1 family." §8:500 (9)-(10).

27.     The only exceptions are if a property is deemed, in the City's unfettered and arbitrary discretion, to be an "owner-occupied single-family attached [or] detached" dwelling,[1] or if it is a "home[] for the aged … licensed by the State of Michigan." §8:511(1)(a).

28.     However, even "Owner-occupied dwellings **may** be inspected either upon a request of the owner or upon receipt of a complaint of a health, safety or welfare violation." §8:501 (emphasis added).

29.     At least one inspection is required every 2.5 years. §8:511(1)(a).

30.     Moreover, "[n]o person shall lease or otherwise make a dwelling or

---

[1] As described below, Plaintiff's homes have at all relevant times qualified as owner-occupied single-family homes. However, with no change in Plaintiff's use of or the layout of the home, the City and its agents have at various points arbitrarily deemed the Seventh Street home owner-occupied and not owner-occupied, single-family and two-family, underscoring the arbitrary and capricious nature of the City's designation of a home into these categories and its ability to subject any private home in Ann Arbor to coerced governmental intrusion.

rooming unit available for occupancy if a certificate of compliance is not in effect for the unit." §8:516(4).

31.    A certificate of compliance may only be issued to property owners after the home at issue has undergone a government inspection ("A certificate shall be issued only upon inspection of the premises by the Building Official…"). *See* §8:516(3)(a).

32.    Further, the Code authorizes City officials to conduct a full inspection of a home, curtilage, and outbuildings in response to a specific and narrow complaint unrelated to the entire home, §8:511(2), or at any time "in the manner best calculated to secure compliance with the code," in the unfettered and arbitrary discretion of City officials. §8:511(1)(b).

33.    Troublingly, the Code also states that "[u]pon an emergency," defined as when "the Building Official has reason to believe" in his unfettered discretion, "that a condition hazardous to health or safety exists requiring immediate attention," "the inspector or team of inspectors shall have the right to enter" any property "at any time." §8:511(1)(d).

34.    During these inspections, city officials search for evidence that can result in civil or criminal charges and/or appointment of a receiver over the property and/or condemnation of the property. *See* §8:519.

35.    Evidence adduced through inspection can further result in suspension

or denial of the certificate of compliance the City demands in order to rent any portion of a home. §8:516(3)(d).

36.    The Code authorizing the inspections does not specify their scope.

37.    The Code simply alludes to inspections "on a periodic basis," and states that "[a]n inspection shall be conducted in the manner best calculated to secure compliance with the code and appropriate to the needs of the community," and further, that a certificate of compliance shall issue only if "a dwelling conforms to this Code." §§ 8:511(1)(a); 8:511(1)(b); 8:516(3)(a).

38.    To the extent that the scope of the search is thus implied by Section 8:501.01 ("Purpose of the Code"), a broad array of housing regulations apply.

39.    The Code enumerates dozens and dozens of separate items, as disparate as "peeling paint," "bathroom light and ventilation," "general cleanliness," and "height of ceilings and doors."

40.    The City also publishes a "Rental Housing Pre-inspection Checklist for Chapter 105 of City Code" enumerating dozens of inspection items, but making clear "additional items not on [this] list may be cited." (**Ex. 2**)

41.    The Code and the City's Checklist make clear that a thorough search is to be made of the exterior premises, interior premises, inlcuding kitchen, hallways, laundry, basement, bedrooms, bathrooms, and even outbuildings or detached garages on a property.

42.    The City charges "inspection fees," per unit, for each "initial inspection" and each "2nd re-inspection and beyond."  (**Ex. 3**)

43.    Code inspection fees for "initial" inspections are approximately $175 per unit per inspection.

44.    Code inspection fees for "re-inspections" are approximately $75 per unit per inspection.

45.    Numerous additional fees apply, including fees for "Posting of Property" ($100), "Ticket Issuance" ($250 per ticket issued), and for refusing entry to an inspector (equal to the respective inspection fee).

46.    Upon information and belief, over the years the City has targeted literally thousands of Ann Arbor homes.

47.    It forces property owners to agree to warrantless searches of their homes or face civil and criminal charges, and upon information and belief the City has collected hundreds of thousands of dollars in inspection and associated fees.

### Defendants' threats of enforcement against Plaintiff to coerce inspection and in retaliation for exercising his first amendment rights

48.    Plaintiff is unmarried and has no children, and enjoys the company of a community of roommates as a vital and enriching part of his life.

49.    His two homes are located approximately a mile from each other, and for over a decade Plaintiff has occupied both homes, splitting his time between the

two residences and exercising quiet enjoyment of both.

50.     This arrangement fosters a communal environment, where Plaintiff and roommates from both homes can socialize, share resources, and enjoy each other's companionship.

51.     Plaintiff even sets aside a percentage of the rent he collects from his roommates for a "social fund," which facilities group trips to sports games, game nights with refreshments, and other like activities.

52.     Roommates at the Seventh Street home also have access to the Huron Street home, and enjoy its hot tub and exercise equipment.

53.     Plaintiff purchased his first home, at 1309 South Seventh Street, in October of 2000.

54.     Plaintiff was 31 years old.

55.     At that time, the home was a duplex with tenants in each of the first floor and second floor apartments.

56.     It had existed as a duplex, defined by the Code as a "two-family dwelling," §8:500(9)(b), since it was built in the 1950s.

57.     Conversely, a "Single-family dwelling" is defined as "a dwelling unit occupied as a single housekeeping unit by only 1 family or functional family (as defined in Chapter 55), **plus not more than 3 roomers or boarders**." §8:500(9)(a) (emphasis added).

12

58.    An "Owner-occupied dwelling" is defined as a "dwelling occupied by its owner, or by members of his/her family, on a non-rental basis, or leased by said owner to a tenant or successive tenants for a period not exceeding, and not intended to exceed, 2 years, during which period, the owner does not reside in Ann Arbor." §8:500(23).

59.    Within months of Plaintiff's purchase of the home, the City began to exert its overzealous and unconstitutional Code enforcement regime on Plaintiff, demanding he agree to a government inspection or face civil and/or criminal penalties.

60.    Plaintiff has never voluntarily and knowingly consented to the Code inspections.

61.    Each inspection of plaintiff's property was coerced through the implied threat of loss of property or liberty; and plaintiff continues to be coerced into providing involuntary consent to such inspections.

62.    The City's housing inspector at that time, Defendant Rita Fulton, inspected Plaintiff's Seventh Street premises and demanded Plaintiff cease using it as a duplex, stating in her inspection report: "Change of use of building from a two family to a single family, owner occupied with 3 borders [sic].  Per zoning (R1D), this building cannot be returned to a two family without Zoning approved.  **This building will be recertified as a single family**." (**Ex. 4**) (emphasis added).

13

63.    The Seventh street home is therefore a single-family home, and at present Plaintiff occupies the home while renting rooms to up to 3 unrelated boarders at a time.

64.    Plaintiff purchased his second home, 1421 West Huron Street, in March of 2004.

65.    The Huron Street home is a single-family, owner-occupied home, and at present Plaintiff occupies the home while renting rooms to up to 3 unrelated boarders at a time.

66.    Perhaps in response to Plaintiff's non-traditional, communal lifestyle, the City and its agents have consistently harassed and singled out Plaintiff for unequal treatment, targeting him with constant unwarranted enforcement actions and demanding warrantless entry into his homes.

67.    For example, on or about August 20, 2012, City inspectors entered and searched the first floor of Plaintiff's Seventh Street home without his permission or a warrant (claiming a "tenant granted access").

68.    On or about August 21, 2012, the City's Rental Housing Supervisor, Defendant Lisha Turner-Tolbert, posted a "Notice of Uninhabitable Building" on Plaintiff's Seventh Street home, for "renting/occupying without a valid certificate of compliance," and because the home was allegedly still a "non-conforming duplex," and because Plaintiff refused to allow the City to perform a further warrantless

inspection of his home. (**Ex. 5**)

69.    Incensed, Plaintiff, in or about September 2012, scheduled and attended two meetings with Ann Arbor's mayor at that time, John Hieftje.

70.    Plaintiff exercised his first amendment right, complaining vociferously to Mayor Hieftje because the Seventh Street property had been unilaterally changed from a two-family home to a single-family home, and about the Rental Housing Services department's[2] conduct toward Plaintiff, and about specific City officials, including Defendants Rita Fulton and Lisha Turner-Tolbert, that Plaintiff perceived to be targeting him.

71.    The City and its agents at the Rental Housing Services department were on notice of Plaintiff's protected conduct and complaints to the mayor.

72.    Upon information and belief, the City and its agents retaliated against Plaintiff by redoubling their arbitrary and capricious enforcement actions against him for years thereafter.

73.    For example, on or about October 12, 2012, the City again posted a "Notice of Uninhabitable Building" on Plaintiff's door.

74.    The City also issued Plaintiff a letter stating he must submit to a warrantless inspection on December 17, 2012 or he would be issued "court

---

[2] Upon information and belief, the duties of this department relevant to this lawsuit were later assumed by the City's current Building Department.

appearance tickets."

75.    In addition, the letter stated he would be charged "a cancellation fee equivalent to the inspection fee," "…plus $50 per scheduled hour" if he did not appear and submit to inspection on that date. (*Id.*)

76.    Under coercion and duress, and facing criminal charges, Plaintiff did not prevent the City's inspection.

77.    Plaintiff did so only to avoid criminal liability and preserve his right to continue renting out his property; Plaintiff did not voluntarily consent to any search of any of his property.

78.    In addition, in an effort to avoid further persecution by the City and its Rental Housing Services Department, Plaintiff stopped treating the Seventh Street home as a duplex, and began to occupy it as an owner-occupied single-family dwelling, as the City required.

79.    Plaintiff rented rooms, to no more than three unrelated boarders at a time, while occupying the home himself, exempting the property from the City's inspection/certificate of compliance regime by the Code's plain language. § 8:501

80.    And yet, in 2015, the City *again* targeted Plaintiff, once again demanding he submit to a warrantless inspection of his home and obtain a certificate of compliance.

81.    This time Plaintiff did not submit, and the City brought its full police

powers to bear on him, charging him in or about March of 2016 with two misdemeanors for: 1) "failure to provide access for inspection"; and 2) "Failure to maintain certificate of compliance". (**Ex. 6**)

82.     These charges was 1) spurious, given that Plaintiff maintained his Seventh Street home as an owner-occupied single-family home, exempt from inspection and the certificate of compliance requirement, and 2) in retaliation for Plaintiff's vocal criticism of the City and its code enforcement agents.

83.     When Plaintiff obtained a lawyer to safeguard his rights, the charges were dismissed by the City *nolle prosequi*.

84.     And yet, Defendants continued to harass and persecute Plaintiff.

85.     In or about July, 2018, Plaintiff was *again* charged, under the same facts, with the same crime: "renting without a certificate of compliance". (**Ex. 7**)

86.     Once again, this charge was spurious, given that Plaintiff continued to maintain his Seventh Street home as an owner-occupied single-family home, exempt from inspection and the certificate of compliance requirements.

87.     This charge was part of an ongoing pattern of retaliation for Plaintiff's vocal criticism of the City and its enforcement agents and unequal treatment singling out Plaintiff as opposed to the similarly situated owners of other owner-occupied single-family homes in Ann Arbor.

88.     For a second time, when Plaintiff obtained a lawyer to protect his rights

17

the City dismissed the charge, representing in court that it would obtain an administrative warrant to search Plaintiff's Seventh Street home.

89.     The City did not obtain an administrative warrant, on information and belief, because it always lacked probable cause to do so.

90.     After the charges were dismissed, Plaintiff again engaged in protected speech, meeting with Ann Arbor's current mayor, Christopher Taylor in or about October 2019, to complain about the City's Building Department's ongoing and continuing pattern of retaliation and discrimination.

**Plaintiff's Current Status, and 2022 Roommate Complaint to the City**

91.     In or about early December, 2022, Plaintiff's Seventh Street home had a leak from a second-floor toilet that caused water to leak through the ceiling of the first-floor bathroom.

92.     The problem never repeated, and resulted from a plugged second floor toilet.

93.     Then, beginning on or around January 8, 2022, Plaintiff's Seventh Street home had a sewage backup in the basement.

94.     One of Plaintiff's roommates at the time, Lauren Williams, notified Plaintiff on or about January 9, 2022 and Plaintiff, a licensed builder, cleaned the basement and snaked the sewer pipe to the street that same day.

95.     However, it turned out the problem was caused by "Orangeburg pipe"[3] sewer lines and the problem reoccurred on or about February 6, 2022. Unaware the problem was failed Orangeburg pipe, Plaintiff hired a contractor to resnake the pipes and remove any blockages.

96.     When the problem reoccurred a third time, on or about February 8, 2022, Plaintiff had the contractor videoscope the sewer pipe and determined the issue was failed Orangeburg pipe.

97.     Plaintiff ultimately had to have all of the failed pipe between the house and the City sewer system replaced, at a cost of approximately $18,350.00. This work commenced shortly thereafter in or about late February 2022.

98.     However, before Plaintiff could have the piping replaced, on or about February 11, 2022 Ms. Williams made a complaint to the City's Building Inspector, Defendant Glenn Dempsey.

99.     Ms. Williams was upset the toilet had leaked, and about the sewer line backups in the basement.

100.    Ms. Williams moved out shortly thereafter, on or about February 17, 2022.

101.    Meanwhile, Plaintiff was out of town from February 5, 2022 to

---

[3] https://en.wikipedia.org/wiki/Orangeburg_pipe

February 27, 2022.

102.    In Plaintiff's absence, perhaps finally seeing an opportunity for the City to gain access to Plaintiff's home, Defendants obtained an administrative warrant based on Ms. Williams' complaint on or about February 17, 2022.

103.    That same day, a cadre of City officials, including Defendant MacFarland and an armed police officer, spent over an hour searching and photographing **all** areas of Plaintiff's home, curtilage, and outbuildings in response to a specific and narrow complaint relating to a plumbing leak in the basement.

104.    Defendants issued a letter to Plaintiff dated February 25, 2022, which, once again, demanded Plaintiff submit to warrantless government inspection of his private home in order to obtain a certificate of compliance, despite the home being an owner-occupied single-family home exempt from inspection, or face "further enforcement action." (**Ex. 8**).

105.    Having **twice** before been charged criminally by the City under the same facts, Plaintiff now reasonably fears Defendants will criminally charge him again.

106.    Moreover, for the first time in over twenty years, the City's letter stated "[b]ased on the inspection and investigation, the dwelling meets the definition of a **two-family** dwelling in accordance with section 8:500 of the Housing Code." (emphasis added) (*Id*).

107.    Plaintiff has of course occupied the home as a single-family home, acting for many years in reliance on the City's previous representations that the property is not allowed to be a two-family dwelling and alleged recertification of the home as a single-family dwelling.

108.    The City's abrupt about face, and effort first to persecute Plaintiff for treating the home as a two-family dwelling and now for treating the home as a single-family dwelling is the very definition of arbitrary and capricious enforcement.

109.    Upon information and belief, Defendants periodic and ongoing enforcement decisions are based on animus towards Plaintiff, and are in retaliation for Plaintiff's protected speech.

## General Allegations

110.    Plaintiff maintains standing to bring this action because if he does not consent to a warrantless search of his property he is faced with (1) criminal charges and fines; and/or (2) loss of all rental income related to his Ann Arbor properties.

111.    The City has inspected and searched Plaintiffs' private property on more than one occasion.

112.    After each inspection, no exigent risks of public or private harm existed.

113.    The City coerced each and every such inspection of Plaintiff: (1) Plaintiff consented to the searches only to avoid criminal liability and preserve his right to continue renting out rooms and having roommates; and (2) Plaintiff did not

voluntarily consent to any search of his properties.

114.    Plaintiff now intends to refuse all further efforts by the City to (1) inspect his properties without a valid administrative warrant; and (2) collect fees from him to fund the inspection of his properties or the properties of others.

115.    As a consequence of this abstention, Plaintiff is in imminent risk of facing criminal charges and/or loss of his property rights in response to this assertion of his Fourth Amendment rights.

116.    Plaintiff is obligated by contract to provide his roommates with a fit and habitable property, free from any nuisances and/or other dangerous conditions, and understands and abides by these terms.

117.    Plaintiff is not currently in violation or has ever been found to be in violation of his contractual obligations.

118.    Plaintiff cares deeply for the well-being of his roommates, who he does not view just as boarders but as friends and companions, many of whom have attested to his above-and-beyond care and concern, and he carefully maintains his homes.

## DECLARATORY JUDGMENT AND INJUNCTION
### (28 U.S.C. § 2201, *et seq.*)

119.    Plaintiff hereby incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein.

120.    An actual controversy has arisen and now exists between Plaintiff and Defendants concerning Plaintiff's rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time.

121.    A state actor is liable under 42 U.S.C. § 1983 if it took "action pursuant to official policy of some nature [that] caused a constitutional tort."[4]

122.    "[Governmental] liability may be imposed for a single decision by [government] policy makers under appropriate circumstances."[5]

123.    A state actor cannot constitutionally condition the receipt of a benefit, such as a rental permit, liquor license, or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights, particularly one's right to be free from unlimited warrantless searches of private property without probable cause.[6]

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)

[5] *Id.* at 480

[6] *Id.*, citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972) ("For at least a quarter- century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech."); *Keyishian v. Board of Regents*, 385 U.S. 589, 606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967) (quoting *Sherbert v. Verner*,374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963)) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

124.   Plaintiff desires a judicial determination of his rights against Defendants as they pertain to Plaintiff's right to be free from unlawful searches, coerced surrender of property rights and/or privileges, and vague licensing requirements.

125.   In order to prevent violation of Plaintiff's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring unconstitutional, facially and as-applied here, all relevant portions of the City of Ann Arbor, Michigan Housing Code that require property owners to submit to warrantless searches of their homes to obtain a certificate of compliance, under threat of civil and criminal penalties, as well as Defendants' enforcement policies, practices, and actions related to these portions of the  Code.

126.   Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions prohibiting the Defendants from enforcing their search policies and all policies, practices, and conduct reliant on and related to the Code's search policies, including but not limited to the Code's search fees and certificate of compliance requirements, to the extent they are unconstitutional, in order to prevent the ongoing violation of Plaintiff's constitutional rights.

**Defendants' Misapplication of the Code to Plaintiff's Properties in Specific**

127.    In the alternative, if the relief sought above is not granted, Plaintiff seeks a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring that his homes are both "owner-occupied" "single-family" "dwellings", as defined by the Code, and therefore no certificate of compliance is required for his Seventh Street or West Huron Street homes.

128.    Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions prohibiting the Defendants from subjecting Plaintiff's owner-occupied single-family homes to the certificate of compliance and warrantless inspection requirements set forth in the Code.

## COUNT I
### VIOLATION OF RIGHT TO DUE PROCESS AND FREEDOM FROM UNCONSTITUTIOTIONAL SEARCHES PURSUANT TO THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

129.    Plaintiff incorporates by reference all of the foregoing paragraphs as if fully restated herein.

### Violation of the Unconstitutional Conditions Doctrine

130.    The Supreme Court's "Unconstitutional Conditions" Doctrine arises from the Due Process guarantees articulated in the Fifth and Fourteenth Amendments to the United States Constitution.

131.    The Supreme Court of the United States has confirmed in a variety of contexts that "government may not deny a benefit to a person because he exercises a constitutional right."[7]

132.    The Supreme Court has further explained that "[t]hose cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."[8]

133.    The Supreme Court has consistently applied the Unconstitutional Conditions Doctrine within the context of land use permitting.[9]

134.    "[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."[10] Further, the right

---

[7] *Regan v. Taxation With Representation of Wash*., 461 U.S. 540, 545 (1983). *See also, e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, 59–60 (2006); *Rutan v. Republican Party of Ill*., 497 U.S. 62, 78, 110 S.Ct. 2729 (1990).  In *Perry v. Sindermann*, 408 U.S. 593 (1972), for example, a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration.

[8] *Koontz v St. Johns River Water Management Dist*., 133 S.Ct. 2586, at 2594 (2013).

[9] *Id*. (explaining that "land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take.").

[10] *Koontz, supra*

to rent property in Michigan, like the right to exclude others from private property, is not merely a "government benefit," but rather, is an extension of one's private property rights - - rights recognized by the Michigan Constitution and Michigan Supreme Court as fundamental.

135.    Defendants imminently threaten to pressure Plaintiff into forfeiting his Fourth Amendment rights by, in response to the exercise of those rights, 1) withholding the certificate of compliance needed to rent homes in Ann Arbor and/or (2) prosecuting Plaintiff for civil and/or criminal violations, should he rent a room in his home without the certificate of compliance.

136.    Defendants burden Plaintiff's Fourth Amendment rights by operation of law, through maintaining and enforcing the offending portions of the Code.

**Violation of the Fourth Amendment's Search and Seizure Clause**

137.    The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

138.    The Fourth Amendment indicates with some precision the places and things encompassed by its protections: persons, **houses**, papers, and effects.

139.    The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "Government obtains information by physically intruding" on persons, houses, papers, or effects, "a

'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred."[11]

140.    The Supreme Court has declared warrantless searches "*per se* unreasonable."[12]

141.    Since *Camara v. Mun. Court of City and County of San Francisco* and *See v. City of Seattle*, each decided in 1967, building code search statutes have been held unconstitutional unless they require a search warrant supported by administrative probable cause.[13]

142.    *Camara* held that administrative inspections are significant intrusions on Fourth Amendment rights for which warrants generally are required.

143.    *Camara* further held that warrantless searches of residential rental property by municipal inspectors violated the Fourth Amendment protection against unreasonable searches and seizures.

144.    In *See v. City of Seattle*, the Supreme Court held that, like the search of a private home, the search of a business is presumptively unreasonable if conducted without a warrant, as a businessperson's Fourth Amendment guarantees are "placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can

---

[11] *United States v. Jones*, 132 S.Ct. 945, 950–951, n. 3 (2012)
[12] *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (internal quotation marks omitted); *see Groh v. Ramirez*, 540 U.S. 551, 559 (2004)
[13] 387 U.S. 523 (1967)

be made and enforced by the inspector in the field without official authority evidenced by a warrant,"[14] as, "[i]t is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence."[15]

145.   In *Hodgins v. U.S. Department of Agriculture,* the Sixth Circuit Court of Appeals held "for warrantless searches to be justifiable under a regulatory scheme, the object of the search must be something that can be quickly hidden, moved, disguised, or altered beyond recognition, so that only a surprise inspection could be expected to catch the violations. On the other hand, if a regulation is similar to a building code (as in *See v. Seattle*), where violations will be harder to conceal, the need for surprise will be less pressing, and warrantless searches will more likely be unconstitutional."[16]

146.   An exception to the warrant requirement has been recognized for searches of pervasively or closely regulated industries.[17]

147.   Plaintiff's rental of rooms in his private home to roommates is not a "pervasively or closely regulated industry."

148.   The Sixth Circuit Court of Appeals has concluded that even "sexually

---

[14] *Id.*, at 543
[15] *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978)
[16] 238 F.3d 421 (2000).
[17] *See New York v. Burger*, 482 U.S. 691 (1987) (junkyard industry); *Donovan v. Dewey*, 452 U.S. 594 (1981) (coal mining); United States v. Biswell, 406 U.S. 311 (1972) (firearms).

oriented businesses" such as "adult cabarets" do not qualify as "pervasively or closely regulated businesses."

149.    The Code's certificate of compliance inspection requirement is warrantless.

150.    Plaintiff and other Ann Arbor homeowners are required by the City to voluntarily submit to warrantless inspection of their homes.

151.    The Code's inspection requirement, as a physical intrusion into a home to collect information that can later be used in a criminal prosecution, is a "search," as contemplated by the Fourth Amendment.

152.    The warrantless inspection of homes located within the City of Ann Arbor is not "necessary to further the regulatory scheme" here: the City could (and does) operate a complaint-driven scheme, or one that otherwise relies upon probable cause.

153.    The Code searches violate Plaintiff's right to be free from unreasonable searches by (1) coercing his consent to such searches, and (2) violating Plainitff and other tenants' reasonable expectation of privacy, while (3) maintaining no warrant requirement.

154.    In *Baker v. City of Portsmouth*, a housing code and inspection regime substantially similar to the offensive portions of the City of Ann Arbor's Code was deemed a violation of the Plaintiff homeowners' fourth amendment rights, where, as

here, they were coerced into consenting to warrantless searches of their rental properties in order to obtain a rental permit.[18]

155.    In response, the State of Michigan amended its laws to strengthen privacy protections for tenants and landlords, and prevent similarly unconstitutional searches in Michigan.

156.    Michigan's state legislature has thus recognized that housing code provisions such as the one at issue in *Baker*, substantially similar to the offending provisions of the City of Ann Arbor's Code, are violative of property owners' Fourth Amendment rights.

## Violation of the Fourth Amendment's Warrant Clause

157.    The second clause of the Fourth Amendment affirms "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

158.    The Fourth Amendment to the United States Constitution guarantees Plaintiffs the right to refuse warrantless government inspections of their home unless the government first secures a valid administrative search warrant issued by a neutral party authorized to issue an administrative search warrant, or unless an emergency exists.

---

[18] 2015 WL 5822659, at *1 (S.D. Ohio Oct. 1, 2015)

159.    While the City's Code authorizes Defendant City of Ann Arbor to obtain an administrative warrant, if probable cause exists, in order to search homes in response to tenant complaints, § 8:511(3), it also requires homeowners to consent to warrantless searches in order to obtain certificates of occupancy, *inter alia,* the regulatory scheme (1) does not make provision for a warrant to be obtained; (2) is not predicated on neutral principles; (3) is tantamount to a general warrant inviting an open search; and (4) does not require probable cause.

160.    Moreover, even in response to tenant complaints, upon information and belief, Defendants routinely obtain warrants unsupported by probable cause, and therefore conduct searches in violation of the Fourth Amendment.

161.    The actions of the individual Defendants were the direct and proximate result of the policy, practice and custom of the City of Ann Arbor as adopted and implemented by Defendants.

162.    Individual Defendants are not entitled to qualified immunity as no reasonable government official would have undertaken these actions.

163.    As a result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer damages, including loss of the value, use, and enjoyment of his property, additional expenditures, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

## COUNT II
## VIOLATION OF RIGHT TO EQUAL PROTECTION PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)

164. Plaintiff incorporates by reference all of the foregoing paragraphs as if fully restated herein.

165. Plaintiff was treated differently than similarly situated owners of "owner-occupied" "single-family" "dwellings" in Ann Arbor, as those terms are defined by the Code, and there was no rational basis for the differential treatment such that Defendants' treatment of Plaintiff was arbitrary and capricious.[19]

166. Individual Defendants undertook these actions under color of state law.

167. These actions were undertaken via a policy, practice, or procedure of Defendant City of Ann Arbor.

168. Individual Defendants are not entitled to qualified immunity as no reasonable government official would have undertaken these actions.

169. As a result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer damages, including loss of the value, use, and enjoyment of his property, additional expenditures, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the

---

[19] *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

physical effects associated therewith, and will so suffer in the future.

**COUNT III**
**FIRST AMENDMENT RETALIATION PURSUANT TO THE UNITED**
**STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

170.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

171.    Plaintiff engaged in constitutionally protected speech by strenuously opposing Defendants' arbitrary and capricious designations of his Seventh Street home first as a single-family dwelling and now as a two-family dwelling, by opposing the City Rental Housing Services department's conduct towards him, and by speaking out about specific Defendant City officials unfairly targeting Plaintiff for enforcement actions.

172.    As a result of Plaintiff's constitutionally protected activities, Defendants conspired to, and did, retaliate against Plaintiff by subjecting him to an ongoing campaign of harassment designed to chill his speech, including, but not limited to, spuriously charging Plaintiff twice with nearly identical criminal charges; illegally inspecting his property, and; continuously preventing and disturbing his quiet enjoyment of his private homes.

173.    Defendants each acted in concert and under color of state law to retaliate against Plaintiff for his First Amendment protected activity.

174.    These actions were undertaken via a policy, practice, or procedure of Defendant City of Ann Arbor.

175.    Individual Defendants are not entitled to qualified immunity as no reasonable government official would have undertaken these actions.

176.    As a result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer damages, including loss of the value, use, and enjoyment of his property, additional expenditures, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

## COUNT IV
## GROSS NEGLIGENCE

177.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

178.    Defendants owed Plaintiff a duty to not negligently disregard his constitutional rights and to not harass and persecute Plaintiff for exercising the quiet enjoyment of his homes.

179.    Defendants grossly breached their duty to Plaintiff.

180.    As a result of Defendants' breach, Plaintiff was injured as a result of Defendants' actions.

181.    As a result of Defendants wrongful actions, Plaintiff suffered and

continues to suffer damages, including loss of the value, use, and enjoyment of his property, additional expenditures, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

## COUNT V
## UNJUST ENRICHMENT
### *(Against Defendant City of Ann Arbor)*

182.    Plaintiff incorporates by reference all of the foregoing paragraphs as if fully restated herein.

183.    Defendant City of Ann Arbor has acquired and/or is in possession of funds that it is not entitled to retain.

184.    Unjust enrichment exists when there is: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.

185.    Through its inspection and permitting fee assessments, Defendant City of Ann Arbor has acquired funds rightfully belonging to Plaintiff and others.

186.    Defendant acquired these funds to fund unconstitutional searches of Plaintiff's properties.

187.    It would be unconscionable for the City of Ann Arbor to retain and/or abstain from returning the permitting fees acquired from Plaintiff and others.

## COUNT VI
## EQUITABLE ESTOPPEL

188.   Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

189.   Plaintiff ceased renting his Seventh Street home as a duplex years ago and occupied it as a single-family home because the City required him to do so.

190.   Plaintiff did so in justifiable reliance on Defendants' representations and actions, including, but not limited to, notifying him in writing numerous times over many years that the City had designated his property as a single-family home.

191.   Plaintiff has been prejudiced by Defendants' arbitrary and capricious recent about face, and sudden insistence the property is in fact a two-family home.

192.   As a result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer damages, including loss of the value, use, and enjoyment of his property, economic loss, loss of reputation, humiliation and embarrassment, and will so suffer in the future.

## COUNT VII
## HEADLEE AMENDMENT VIOLATION: MICH. CONST, ART 9, § 31
### *(Against Defendant City of Ann Arbor)*

193.   Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

194.   Michigan's Headlee Amendment provides that:

Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

Mich. Const. Art. 9, § 31

195.    Defendant City of Ann Arbor has charged Plaintiff "inspection", "re-inspection", and associated fees in excess of $1,000.00 in total.

196.    Additionally, Defendant City of Ann Arbor has an extensive schedule of fees purportedly related to inspection and re-inspection of homes required for the aforementioned certificate of compliance.

197.    In addition to "Inspection fees" ($175 per unit) and "re-inspection fees" ($75 per unit), such fees include, but are not limited to, fees for "Posting of Property" ($100), "Ticket Issuance" ($250 per ticket issued), and for refusing entry to an inspector (equal to the respective inspection fee).

198.    These "fees" constitute a revenue-raising device for the Defendant City of Ann Arbor above and beyond any administrative costs necessary for the aforementioned certificate of compliance.

199.    These fees are a tax under Michigan's Headlee amendment, and yet Defendant has illegally imposed the fees on Plaintiff and other residents without a vote by all of the City of Ann Arbor's citizens. *See Bolt v. City of Lansing*, 587 N.W. 2d 264, 459 Mich. 152 (1998).

## <u>CONCLUSION</u>

200.   Criminal and/or civil punishment is an irreparable harm.

201.   Loss of constitutionally-protected First, Fourth, Fifth, and Fourteenth Amendment rights and constitutionally-protected property rights causes irreparable harm.

202.   Enforcement of the constitutional rights specified herein is in the public interest.

203.   Defendants' enforcement of the Code violates the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution by imposing an unconstitutional condition upon Plaintiff's lawful exercise of his property rights.

204.   The Code is unconstitutional as applied to Plaintiff.

205.   The Code's search requirement is unconstitutional on its face.

206.   The Code's search requirement cannot be severed from the Code's inspection fee and certificate of compliance requirements.

207.   The unconstitutional portions of the Code are so intertwined such that they cannot be severed from the Code's lawful portions.

208.   The Code's certificate of compliance provisions fails to meet the requirements necessary to obtain a search warrant.

209.   As a proximate result of Defendants' policies and practices described above, Plaintiff faces imminent threat of irreparable injury and will continue to

suffer irreparable injury, in that he will be deprived of his rights under the Fourth,

Fifth, and Fourteenth Amendment of the Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and that the

Court:

(1) Declare that the aforementioned practices and actions of Defendants were illegal and unconstitutional;

(2) Declare that the certificate of compliance and search provisions in the City of Ann Arbor Housing Code authorizing warrantless searches without probable cause unconstitutional, both facially and as applied to Plaintiff;

(3) Enjoin Defendants from directly enforcing the Code's warrantless search requirement;

(4) Enjoin Defendants from indirectly enforcing the Code's warrantless search requirement by criminally prosecuting Plaintiff, stripping him of the right to rent or enjoy his property, or otherwise;

(5) Mandate the return of Code funds paid by Plaintiff and others to Defendant City of Ann Arbor, to the extent that the City has been unjustly enriched;

(6) Estop the City from arbitrarily and capriciously designating Plaintiff's Seventh Street home not an "owner-occupied" dwelling;

(7) Estop the City from arbitrarily and capriciously designating Plaintiff's Seventh Street home a "two-family" dwelling;

(8) Award Plaintiff monetary compensation for all economic damages past and future incurred as a result of Defendants' unlawful conduct;

(9) Award Plaintiff monetary compensation for emotional and physical distress past and future incurred as a result of Defendants' unlawful conduct;

(10)   Award Plaintiff appropriate equitable relief;

(11)   Award Plaintiff compensatory damages;

(12)   Award Plaintiff exemplary damages;

(13)   Award Plaintiff punitive damages;

(14)   Award Plaintiff reasonable attorney fees, costs and interest;

(15)   Award Plaintiff all costs, including reasonable attorney fees, incurred by Plaintiff in maintaining his Headlee Amendment claim as authorized by MCL 600.308(a)(1) and (6); and

(16)   Award such other relief as this Court deems equitable, just and proper.


Respectfully Submitted,

DeLoof, Dever, Eby, Millman & Issa, PLLC

By:  /s/ Samuel L. Estenson_____
Samuel L. Estenson (P82414)
301 N. Main St., Second Floor
Ann Arbor, MI 48104
(734) 994-1295

sle@deloofdevereby.com

Dated: June 9, 2022

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ROBERT NOSSE,

     Plaintiff,                             Case No.

vi.                                    Hon.

CITY OF ANN ARBOR, MICHIGAN;

GLEN A. DEMPSEY, in his individual
Capacity and in his official capacity;

CHRISTOPHER MCFARLAND, in his
individual capacity and in his official
capacity;

LISHA TURNER-TOLBERT, in her
individual capacity and in her official
capacity;

RITA FULTON, in her
individual capacity and in her official
capacity;

DEREK DELACOURT, in his
individual capacity and in his official
capacity;

and BRANDON BOGGS, in his
individual capacity and in his official
capacity;

     Defendants.

---

Samuel Estenson (P82414)
DeLoof, Dever, Eby, Milliman & Issa, PLLC

301 N. Main St., Second Floor
Ann Arbor, MI 48104
(734) 994-1295
sle@deloofdevereby.com

Charlotte Croson (P56589)
Croson, Taub, & Michaels PLLC
455 E. Eisenhower Pkwy Ste 75
Ann Arbor, MI 48108-3335
734-519-0872
ccroson@ctmlawyers.com

---

## JURY DEMAND

NOW COMES Plaintiff ROBERT NOSSE, by and through his attorneys, DeLoof, Dever, Eby, Milliman & Issa, PLLC and Croson, Taub, & Michaels, PLLC, and hereby demands a trial by jury in the above- captioned matter for all issues so triable.

Respectfully Submitted,
DeLoof, Dever, Eby, Millman & Issa, PLLC

By:  /s/ Samuel L. Estenson
Samuel L. Estenson (P82414)
301 N. Main St., Second Floor
Ann Arbor, MI 48104
(734) 994-1295
sle@deloofdevereby.com

Dated: June 9, 2022