UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT NOSSE,

       Plaintiff,

v.                                      Civil Case No. 22-11283
                                        Honorable Linda V. Parker

CITY OF ANN ARBOR, MICHIGAN,
GLEN A. DEMPSEY, CHRISTOPHER
MACFARLAND, LISHA TURNER-TOLBERT,
RITA FULTON, DEREK DELACOURT,
and BRANDON BOGGS,

       Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

       This is an action challenging Defendant City of Ann Arbor's Housing Code and the enforcement of that code by the individually named defendants who are current or former City of Ann Arbor officials or employees. The individuals are being sued in their official and individual capacities. Plaintiff owns two residential properties in Ann Arbor (hereafter "City"). In a Complaint filed June 9, 2022, Plaintiff asserts the following claims against all defendants, except where noted:

       (I) Violation of right to due process and freedom from unconstitutional searches pursuant to the Fourth, Fifth,

and Fourteenth Amendments to the United States
Constitution under 42 U.S.C. § 1983;

(II)  Violation of right to equal protection pursuant to the
Fourteenth Amendment to the United States Constitution
under § 1983;

(III)  First Amendment retaliation pursuant to the United
States Constitution under § 1983;

(IV)  Gross negligence under Michigan law against
Defendants Christopher McFarland, Glen Dempsey, and
Lisha Turner-Tolbert;

(V)  Unjust enrichment under Michigan law against the
City, only;

(VI)  Equitable Estoppel; and

(VII) Headlee Amendment Violation under Article 9,
Section 31 of the Michigan Constitution against the City,
only.

(*See generally* ECF No. 1; *see also* MTD Resp. Br. at 27 n. 11, ECF No. 17 at Pg

ID 617 ("conced[ing] that there are no acts of gross negligence . . . within the

statutes [sic] of limitations" against any defendants but MacFarland, Dempsey, and

Turner-Tolbert).)

The matter is presently before the Court on Defendants' motion to dismiss,

filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 9) and

Plaintiff's motion for preliminary injunction and expedited hearing filed pursuant

to Federal Rule of Civil Procedure 65 (ECF No. 10).  Both motions have been fully

briefed.  Finding the facts and legal arguments adequately presented in the parties'

2

briefs, the Court dispenses with oral argument pursuant to Eastern District of

Michigan Local Rule 7.1(f).

## I.    Standards of Review

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of

the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134

(6th Cir. 1996).  To survive a motion to dismiss, a complaint need not contain

"detailed factual allegations," but it must contain more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action . . .."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint does not

"suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Twombly*,

550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  The

plausibility standard "does not impose a probability requirement at the pleading

stage; it simply calls for enough facts to raise a reasonable expectation that

discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.

3

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668.

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Defendants attach an administrative warrant to their motion to dismiss (*see* Mot. Ex. 2, ECF No. 9-3), which Plaintiff argues is improperly offered and should not be considered (MTD Resp. Br. at 4 n. 3, ECF No. 17 at Pg ID 594). The warrant, however, is specifically referred to in Plaintiff's Complaint (*see* Compl. ¶ 102, ECF No. 1 at Pg ID 20), and it is central to Plaintiff's claim that Defendants

4

engaged in warrantless searches of his properties.[1]  As such, the Court finds it permissible to consider the warrant when evaluating Defendants' motion.

     "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 868 (6th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Although the district court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000).  The court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive.  *In re DeLoreon Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

---

[1] Plaintiff's clarification of his Fourth Amendment claim in response to Defendants' motion to dismiss renders the warrant even more central.  (*See, e.g.*, MTD Resp. Br. at 24-25, ECF No. 17 at Pg ID 614-15 (explaining that Plaintiff's Fourth Amendment claim has two components, one being that Plaintiff was subjected to an overly broad search in February 2022, which was the search conducted pursuant to the warrant).)

## II.   Background

### A.   Plaintiff's Factual Allegations

Plaintiff owns two homes in the City, which are approximately a mile apart: 1421 West Huron Street ("Huron Street Property") and 1309 South Seventh Street ("Seventh Street Property").  (Compl. ¶¶ 5, 49, ECF No. 1 at Pg ID 4, 11.) Plaintiff purchased the Seventh Street Property in October 2000, and the Huron Street Property in March 2004.  (*Id.* ¶¶ 53, 64, Pg ID 12, 14.)  Plaintiff has occupied both homes, splitting his time between them.  (*Id.* ¶ 49, Pg ID 11-12.)  He also rents a portion of the properties to three or fewer individuals.[2]  (*See* ¶¶ 50-52, 63, 65, Pg ID 12, 14.)

---

[2] In his Complaint, Plaintiff describes these renters as "roommates" and includes other assertions which seem designed to undermine the characterization of the homes as rental properties.  (*See, e.g.*, Compl. ¶¶ 50-52, ECF No. 1 at Pg ID 12.) Plaintiff also takes issue with the City's classification of the properties as single-family dwellings versus two-family dwellings and owner occupied versus non-owner occupied.  (*See, e.g., id.* ¶¶ 62, 68 & n. 1, Pg ID 8, 13, 15.)  However, Plaintiff's characterization of his living arrangements and the classification of the properties have no bearing on the claims alleged in this lawsuit.  Plaintiff does not dispute that units within the properties are rented or that the City's Housing Code requires a valid certificate of compliance to "lease or otherwise make a dwelling rooming unit available for occupancy" or that "[a] certificate shall be issued only upon inspection of the premises by the Building Official."  (*Id.* ¶¶ 30, 31, Pg ID 8-9 (quoting Ann Arbor City Code §§ 8:516(4), 8:516(3)(a)).)  Although at the same time he claims the properties were exempt from the City's inspection/certificate of compliance regime pursuant to the plain language of Housing Code Section 8:501. (*Id.* ¶ 79, Pg ID 16.)

The Seventh Street Property is a duplex with tenants.  (*Id*. ¶ 55, Pg ID 12.)

Within months of Plaintiff purchasing the home in October 2000, the City began

"demanding he agree to a government inspection or face civil and/or criminal

penalties."  (*Id*. ¶ 59, Pg ID 13.)  Plaintiff was coerced into consenting to such

inspections.  (*Id*. ¶ 61, Pg ID 13.)

In August 2012, City inspectors "entered and searched" the first floor of the

Seventh Street Property, claiming a "tenant granted access."  (*Id*. ¶ 67, Pg ID 14.)

On or about August 21, Defendant Lisha Turner-Tolbert, the City's Rental

Housing Supervisor, posted a "Notice of Uninhabitable Building" on the property

for "renting/occupying without a valid certificate of compliance, renting property

as a non-conforming duplex, failure to show for inspection."  (*Id*. ¶ 68, Pg ID 14;

Compl. Ex. 5, ECF No. 1-5.)

In September 2012, Plaintiff attended two meetings with then City Mayor

John Hieftje, at which Plaintiff complained about the building department's actions

with respect to the Seventh Street Property.  (Compl. ¶¶ 69-70, ECF No. 1 at Pg ID

15.)  "The City and its agents at the Rental Housing Services department were on

notice of Plaintiff's protected conduct and complaints to the mayor."  (*Id*. ¶ 71, Pg

ID 15.)

"[O]n or about October 12, 2012, the City again posted a 'Notice of

Uninhabitable Building'" on the door of one of Plaintiff's properties.  (*Id*. ¶ 73, Pg

ID 15.)  The City issued a letter to Plaintiff, informing him that he must submit to a warrantless inspection on December 17, 2012, or he would be issued "court appearance tickets . . . a cancellation fee equivalent to the inspection fee . . . plus $50 per scheduled hour[.]"  (*Id*. ¶¶ 74-75, Pg ID 15-16.)  Plaintiff consented to the inspection, albeit involuntarily to avoid criminal liability and to preserve his right to continue renting out his property.  (*Id*. ¶¶ 76-77, Pg ID 16.)

In 2015, the City sought to inspect the Seventh Street Property in connection with a certificate of compliance but Plaintiff "did not submit[.]"  (*Id*. ¶¶ 80-81, Pg ID 16-17.)  The City issued Plaintiff a misdemeanor ticket for "failure to provide access for rental inspection" and "failure to obtain certificate of compliance."  (*Id*. ¶ 81, Pg ID 16-17; Compl. Ex. 6, ECF No. 1-6.)  On June 24, 2016, the charges were dismissed by order of nolle prosequi.  (*Id*. ¶ 83, Pg ID 17; Compl. Ex. 6, ECF No. 1-6.)

On June 27, 2018, the City again charged Plaintiff with a misdemeanor for "renting without a certificate of compliance" in connection with the Seventh Street Property.  (Compl. ¶ 85, Pg ID 17; Compl. Ex. 7, ECF No. 1-7.)  The City eventually dismissed these charges, as well.  (Compl. ¶ 88, ECF No. 1 at Pg ID 17-18.)

In October 2019, Plaintiff again complained about the building department's conduct to the City's then mayor, Christopher Taylor.  (*Id*. ¶ 90, Pg ID 18.)

8

On January 8, 2022, there was a sewage backup in the basement of the Seventh Street Property. (*Id.* ¶ 93, Pg ID 18.) The following day, Dr. Lauren Williams, who lived at the Seventh Street Property with her husband and their infant, informed Plaintiff and Plaintiff cleaned the basement and snaked the sewer pipe. (*Id.* ¶ 94, Pg ID 18.) When the problem reoccurred on or about February 6, Plaintiff hired a contractor to snake the pipes, again. (*Id.* ¶ 95, Pg ID 19.) Two days later, the sewer backed up into the basement a third time, and a contractor videoscoped the sewer pipe and discovered that a failed pipe was the problem. (*Id.* ¶ 96, Pg ID 19.) Plaintiff replaced the failed pipe between the house and the City sewer system in late February. (*Id.* ¶ 97, Pg ID 19.)

However, on February 11, before the pipe was replaced, Williams made a complaint to the City's Building Inspector, Defendant Glenn Dempsey. (*Id.* ¶ 98, Pg ID 19.) On February 17, Dempsey swore out an affidavit to obtain an administrative warrant to inspect the Seventh Street Property. (*Id.* ¶ 102, Pg ID 20; MTD Ex. 2, ECF No. 9-3 at Pg ID 273-76.) In the affidavit, Dempsey described previous plumbing issues at the Seventh Street Property reported by Williams, including leaks from the second-floor toilet resulting in water running into the first floor, leakage from the first-floor toilet, water rising from the kitchen sink, and the sewage back-ups in the basement. (MTD Ex. 2, ECF No. 9-3 at Pg ID 273-76.) According to Dempsey's affidavit, Williams reported that the first-floor unit of the

property was occupied by her family, that two tenants lived in a second-floor unit, and that Plaintiff had never lived at the Seventh Street Property while she had been a tenant.[3] (*Id.*)  Dempsey requested a warrant to conduct a rental housing inspection of the interior, exterior, and curtilage of the premises.  (*Id.*)

Magistrate Tamara Garwood of the State's 15th District Court signed an administrative warrant for the Seventh Street Property on February 17.  (MTD Ex. 2, ECF No. 9-3 at Pg ID 277.)  The Administrative Warrant indicated that probable cause was found to justify a search of the property, including the interior, exterior, any dwelling units, and outbuildings.  (*Id.*)  The warrant permitted photographs and/or video recordings to document potential code violations.  (*Id.*)

On February 17, City officials, including Defendant McFarland, "spent over an hour searching and photographing all areas of [the Seventh Street Property] . . .." (Compl. ¶ 103, ECF No. 1 at Pg ID 20.)  In a letter to Plaintiff, dated February 25, McFarland indicated that the inspection had occurred pursuant to an administrative search warrant and that violations of the City's Housing Code were found during the inspection.  (*Id.* Ex. 8, ECF No. 1-8 at Pg ID 97.)  McFarland also informed Plaintiff that "[b]ased on the inspection and

---

[3] The Court wants to be clear that it accepts as true Plaintiff's contrary claim that he resides at both properties for purposes of deciding Defendants' motion to dismiss.  Nevertheless, the Court includes this allegation from the warrant to the extent it is relevant regardless of its accuracy.

10

investigation, the dwelling meets the definition of a two-family dwelling in accordance with section 8:500 of the Housing Code[,]" and "[p]ursuant to sections 8:516 and 8:517 of the Housing Code, this dwelling must be registered as a non owner-occupied rental and a certificate of compliance issued."  (*Id.*)  McFarland informed Plaintiff:

> In accordance with section 8:513 of the Housing Code, you have 60 days to correct the violations, register the property as a rental, and obtain a certificate of compliance. . . . You have the right to appeal the violations and time limits in accordance with section 8:515 to the Housing Board of Appeals.
>
> Failure to comply with the options detailed above will result in further enforcement action.

(*Id.*)

## B.    City's Housing Code

The City's Housing Code serves to: (A) "protect the health, safety, and welfare of residents"; (B) "protect a diverse housing stock from deterioration"; and (C) "accomplish (A and B) at the lowest cost to owners and renters in order to keep housing costs as low as possible in a manner consistent with compliance with this Code."  Ann Arbor City Code § 8:500.01.  "Fundamental to achieving this purpose[,]" the code provides, "is a regular, ongoing inspection program and comprehensive, consistent enforcement of the provisions contained within the Code."  *Id.*

11

To this end, the Housing Code provides that "[o]wner-occupied dwellings may be inspected either upon a request of the owner or upon receipt of a complaint of a health, safety or welfare violation." *Id*. § 8:501.  The Housing Code further provides for periodic inspections of all dwelling units (i.e. no longer than two and a half years apart), "except owner-occupied single family attached and detached [dwelling.]" *Id*. § 8:511(1)(a).  The City's Housing Code mandates inspections before a certificate of compliance may be issued.  *Id.* § 8:516(3).  Pursuant to the Housing Code, "[n]o person shall lease or otherwise make a dwelling or rooming unit available for occupancy if a certificate of compliance is not in effect for the unit." *Id*. § 8:516(4).  Certificates of compliance are good for two and a half years and owners are required to arrange inspections prior to their expiration.  *Id*. § 8:516(9).

According to the City's Housing Code, inspections are to "be conducted in the manner best calculated to secure compliance with the code and appropriate to the needs of the community."  *Id*. § 8:511(1)(b).  With regard to "[i]nspection authorization," the Housing Code states, in part:

> In a non-emergency situation, a request for permission shall be made before an inspection to the owner or his agent, or to the occupant, and to both owner or agent and occupant, if both are present.  If the inspection is based upon a complaint, the inspector shall try to schedule the inspection for a time when the complainant will be present.  Where the owner or occupant demands a warrant for inspection of the premises, the Building

12

> Official shall obtain a warrant from a court of competent
> jurisdiction.  The Building Official shall prepare the
> warrant, stating the address of the building to be
> inspected, the nature of the inspection as defined in this
> code or other applicable law, and the reasons for the
> inspection.  It shall be appropriate and sufficient to set
> forth the basis for inspection (e.g., complaint, area)
> established in this section, in other applicable codes or in
> rules or regulations.  The warrant shall also state that it is
> issued pursuant to this section, and that it is for the
> purposes set forth in this and other codes which require
> that inspections be conducted.

*Id.* § 8:511(3)(a).  No warrant is required when there is an emergency.  *Id.*
§ 8:511(3)(c).

Pursuant to the Housing Code, owners are charged a fee for periodic
inspections and any re-inspections required to correct violations.  *Id*. § 8:511(1)(f).
The City has posted a schedule of fees.  (*See* Compl. Ex. 3, ECF No. 1-3.)  The
Housing Code also identifies penalties for violations, which constitute "civil
infractions punishable by a civil fine or no less than $200.00 and no more than
$1,000.00, plus costs and other remedies available by statute."  *Id.* § 8:519(2)(a).

## III.   Defendants' Arguments for Dismissal

Defendants present a number of alternative arguments in support of their
assertion that Plaintiff's claims fail on the merits.  First Defendants argue that
Plaintiff's § 1983, gross negligence, unjust enrichment, and Headlee Amendment
claims are barred to the extent based on conduct beyond the applicable statutes of
limitations: three years for § 1983 and gross negligence; six years for unjust

enrichment, and one year for the Headlee Amendment.  As to the latter claim, Defendants point out that Plaintiff does not allege that he paid or was charged any fee by the City in the year before the Complaint was filed.

Second, Defendants seek dismissal of Plaintiff's claims against the individual defendants in their official capacities, as such claims are duplicative of Plaintiff's claims against the City.  Next, Defendants argue that the Complaint is devoid of allegations identifying specific unlawful conduct by the individual defendants, that is not time-barred, to establish their liability under § 1983.  As to Plaintiff's § 1983 due process claim, in particular, Defendants maintain that the Complaint fails to specifically plead any type of procedural or substantive due process violation and that the First and Fourth Amendments provide explicit sources of textual protection for the deprivations alleged.  Thus, Defendants argue, the due process clause is not a proper vehicle to assert those deprivations.

As to Plaintiff's § 1983 Fourth Amendment claim, Defendants assert that the City Housing Code is not unconstitutional on its face and that Plaintiff fails to plead facts supporting an as applied violation.  Defendant maintains that Plaintiff does not plead facts of an unlawful search of his properties and that the only specific inspection alleged—that being in February 2022—was pursuant to an administrative warrant.  Turning to Plaintiff's § 1983 equal protection claim, Defendants argue that the Complaint is devoid of facts to suggest that similarly

14

situated property owners were treated differently.  Defendants also argue that

Plaintiff fails to plead facts to allege a plausible § 1983 First Amendment

retaliation claim.

Defendants assert that Plaintiff's Complaint is devoid of conduct amounting

to "gross negligence."  According to Defendants, Plaintiff also alleges legal

conclusions devoid of any factual detail to support his unjust enrichment claim.

Defendants argue, and Plaintiff concedes, that equitable estoppel is not an

independent cause of action.  Lastly, Defendants assert that the Complaint contains

no factual allegations to support the legal assertion that any fees charged to or paid

by him constitute a prohibited tax.

The Court addresses only those arguments necessary to decide Defendants'

motion.

## IV.   Discussion

### A.   Statute of Limitations as to Plaintiff's § 1983 Claims

A three-year limitations period applies to Plaintiff's § 1983 claims, which

began to run when Plaintiff knew or had reason to know that the conduct providing

the basis for his injury occurred.  *See Garza v. Lansing Sch. Dist.*, 972 F.3d 853,

867 n. 8 (6th Cir. 2020) (citations omitted).  Plaintiff does not dispute this but

argues that the continuing violations doctrine applies here or, at least, he pleads

15

violations within the limitations period.  (*See* MTD Resp. Br. at 5-10, ECF No. 17 at Pg ID 595-600.)

The Sixth Circuit "rarely extends [the continuing violations doctrine] to § 1983 actions."  *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (citing *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1006 n. 3 (6th Cir. 1995)). Regardless of whether the doctrine is appropriately applied here, to invoke it, Plaintiff must establish an unconstitutional act within the limitations period.  *See Tenenbaum v. Caldera*, 45 F. App'x 416, 419 & n. 3 (6th Cir. 2002) (citation omitted); *Joishy v. Cleveland Clinic Found.*, 3 F. App'x 259, 261 (6th Cir. 2001) (citing *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992) (citing *Hull v. Cuyahoga Valley Joint Vocational Bd.*, 926 F.2d 505, 511 (6th Cir. 1991))).  As discussed below, he does not.

> **B.**    **Fourth, Fifth, and Fourteenth Amendment "Unreasonable Search"**

Plaintiff's claims under the Fourth, Fifth, and Fourteenth Amendments are rooted in the notion that the City requires him to submit to warrantless searches and threatens him with penalties if he does not submit as a condition of renting rooms in his homes.[4]  However, on its face, the City's Housing Code does no such

---

[4] There is merit to Defendants' assertion that Plaintiff's Fifth Amendment due process claim fails because the allegations in support of the claim are more properly addressed under the Fourth Amendment.  *See Halpern 2012, LLC v. City*

thing.  Instead, it provides that "[w]here the owner or occupant demands a warrant for inspection of the premises, the Building Official *shall obtain a warrant* from a court of competent jurisdiction."  Ann Arbor City Code § 8:511(3)(a) (emphasis added).  Where city ordinances provide the opportunity for pre-compliance review before yielding to an inspection and contain an express warrant procedure, courts find them to be constitutional.  *See City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015) (explaining that "in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker"); *Hometown Co-Op Apartments v. City of Hometown*, 515 F. Supp. 502, 503 (N.D. Ill 1981) ("By providing for a warrant procedure in cases in which a new owner or lessee of property refuses to consent to an inspection by the building department, the City of Hometown has remedied the

---

*of Ctr. Line*, 404 F. Supp. 3d 1109, 1119-20 (E.D. Mich. 2019) (citing *Benjamin v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019)); *MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404, 414 (E.D. Mich. 2019) (citing *Benjamin*, 915 F.3d at 1069). "When a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process, must be the guide for analyzing those claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Plaintiff maintains that this Court reached a contrary conclusion in *Landon v. City of Flint*, No. 16-11061, 2017 WL 2798414, at *3 (E.D. Mich. June 27, 2017).  However, the City of Flint did not raise this argument in *Landon*.  *See* Br. in Supp. of Mot, *Landon*, No. 16-11061 (E.D. Mich. filed Jan. 3, 2017), ECF No. 43.  Thus, this Court never considered it there.

fatal flaw in its earlier point of sale inspection ordinance.  The property owner is no longer forced to choose between consenting to a warrantless search or subjecting himself or herself to substantial fines for failure to procure a certificate of inspection."); *Williams v. City of Jackson*, No. 21-10749, 2022 WL 6601298, at *3 (E.D. Mich. Jan. 4, 2022) *adopted in* 2022 WL 4378688 (E.D. Mich. Sept. 22, 2022) ("Jackson's ordinance complies with the Fourth Amendment by requiring enforcing agents to 'obtain a warrant from a court of competent jurisdiction' before entering property without the owner's consent.").

Plaintiff attempts to separate the warrant requirement from the certificate of compliance requirement, as the former is contained in Housing Code section 8:511 but the latter is in section 8:516.  (*See* MTD Resp. Br. at 21-23, ECF No. 17 at 611-13.)  However, "[u]nder accepted canons of statutory interpretation, [courts] must interpret statutes as a whole, giving effect to each work and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) (quotation marks and citations omitted).  It also is a well-settled policy of statutory construction that, where possible, statutes should be interpreted to avoid constitutional defects. *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (citations omitted); *Gomez v. United States*, 490 U.S. 858, 864 (1989) (citing cases); *see also Tobin v. City of Peoria*, 939 F. Supp. 628, 633-34 (C.D. Ill.

18

1996) (quoting *Gomez*, 490 U.S. at 863-64) (finding city's inspection ordinance constitutional when, read as a whole, it incorporates a warrant requirement in the inspection procedure, as doing otherwise "would be ignoring the Supreme Court's directive that courts choose a 'reasonable alternative interpretation'").

Further, the express language of section 8:511(3)(a) reflects that it is applicable to *all* inspections of dwellings by the City. Ann Arbor City Code § 8:511(3)(a)  It requires building officials, when preparing a warrant, to identify "the nature of the inspection as defined in *this code* or other applicable law." *Id.* (emphasis added). It states further:

> It shall be appropriate and sufficient to set forth the basis for inspection . . . established in this section, *or other applicable codes* or in rules or regulations. The warrant shall also state that it is issued pursuant to this section, and that it is for the purposes set forth in this *and other codes which require that inspections be conducted*.

*Id.* (emphasis added). Thus, the Court reads the City's Housing Code as requiring a warrant whenever any type of inspection is required and the owner or tenant does not consent or an emergency exists.

With respect to Plaintiff's "as applied" challenge, he does not allege facts plausibly suggesting that Defendants engaged in any warrantless search of his

19

properties within the applicable limitations period.[5]  Instead, the facts reflect that

any search was conducted pursuant to an administrative warrant.  This is so even if

the Court considers the factual allegations identified by Plaintiff in his response

brief as possible additions to any amended pleading.  (*See, e.g.*, MTD Resp. Br. at

13 n. 6, 15 n. 8, 24-25, ECF No. 17 at Pg ID 603, 605-06, 614-15.)  It is not

enough for Plaintiff to assert that the City "has historically not applied the warrant

provision" or has engaged in "an ongoing pattern of Fourth Amendment

violations."  (*Id.* at 24, 25, Pg ID 614, 615.)  Pursuant to *Iqbal* and *Twombly*,

Plaintiff must plead "sufficient factual matter" to render such legal assertions

plausible.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In other

words, legal assertions—such as that the City engages in warrantless inspections—

are insufficient without "further factual enhancement."  *Id.* (quoting *Twombly*, 550

U.S. at 557).

Plaintiff argues in his response brief that even if the City's searches were

pursuant to a warrant, they were overly broad.  (MTD Resp. Br. at 24, ECF No. 17

at Pg ID 614.)  The only search Plaintiff describes with any detail is the February

---

[5] As Defendants also point out, even outside the limitations period, Plaintiff does
not actually allege an unconstitutional search.  Although artfully worded, his
allegations reflect that any warrantless search was conducted upon a tenant's or
Plaintiff's consent, despite Plaintiff's assertion that his consent was provided under
duress and coercion.  (*See* Compl. ¶¶ 75-77, ECF No. 1 at Pg ID 16.)

22 search of the Seventh Street Property.  Plaintiff takes issue with the scope of the search—"**all** areas . . . in response to a specific and narrow complaint relating to a plumbing leak in the basement."  (Compl. ¶ 103, ECF No. 1 at Pg ID 20 (emphasis in original).)

However, a review of Dempsey's affidavit in support of the administrative search warrant reflects that the information Defendants received was not limited to the basement.  The affidavit, relying on a tenant's report, identifies plumbing issues on all floors.  Moreover, as the affidavit reflects, units within the property were being leased to tenants without a valid certificate of compliance.  Thus, the affidavit supported an inspection not only to address Williams' complaints but also to assess the habitability of the property and adherence to the Housing Code, generally.  Further, the search was pursuant to an administrative warrant, issued by a neutral magistrate, allowing for a search of all areas of the property.  *See Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 334-45 (1986)) ("In § 1983 actions, an officer ordinarily receives qualified immunity if he or she relies on a judicially secured warrant" unless "the warrant is so lacking in the indicia of probable cause that [the officer]'s reliance on the warrant is unreasonable.").  In short, Plaintiff also fails to plead a plausible Fourth Amendment claim premised on his assertion that the February 2022 search was overbroad.

Undoubtedly, the City's Housing Code requires Plaintiff to obtain a certificate of compliance demonstrating the habitability of his properties before renting units within those properties for occupancy.  Ann Arbor City Code § 8:516(4).  And clearly the only means for City officials to determine whether a certificate of compliance should issue is through an inspection of the properties. *See Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523 (1967) (recognizing the necessity of "routine periodic inspections of all structures" to "effective[ly] . . . seek universal compliance with the minimum standards required by municipal codes" as many conditions "are not observable outside the building and may not be apparent to the inexpert occupant himself").  But, as the district court found in *Halpern 2012, LLC v. City of Center Line*, 404 F. Supp. 3d 1109 (E.D. Mich. 2019), "there is nothing wrong with that.  'It is beyond all dispute that local municipalities are empowered to regulate land use in order to maintain or improve the quality of life within their communities.'"  *Id*. at 1119 (brackets omitted) (quoting *15192 Thirteen Mile Rd., Inc. v. City of Warren*, 626 F. Supp. 803, 823 (E.D. Mich. 1985)), *aff'd* 806 F. App'x  390 (6th Cir. 2020); *see also MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404, 413 (E.D. Mich. 2019) (same).  "The underlying requirements that rental properties possess certificates of compliance and failure to do so may result in a blight violation are lawful, as is the requirement that landlords demonstrate compliance before being allowed to rent

22

the property to tenants." *Halpern, 2012*, 404 F. Supp. 3d at 1119; *MS Rentals*, 362 F. Supp. 3d at 413.

For these reasons, the Court concludes that Plaintiff's Fourth, Fifth, and Fourteenth Amendment claims alleging unconstitutional searches are subject to dismissal.

### C.     Fourteenth Amendment Equal Protection

To plausibly plead an equal protection violation, Plaintiff must allege "that the government treated [him] disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Courser v. Allard*, 969 F.3d 604, 617 (6th Cir. 2020) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)).  Plaintiff does not allege that he was part of a suspect class or that a fundamental right was burdened by Defendants' conduct.  Instead, he alleges that he "was treated differently than similarly situated owners of 'owner-occupied' 'single-family' 'dwellings' in Ann Arbor" and that "there was no rational basis for the differential treatment."  (Compl. ¶ 165, ECF No. 1 at Pg ID 33.)

Plaintiff is asserting a "class of one" equal protection claim.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from

23

others similarly situated and that there is no rational basis for the difference in treatment.").  To make out such a claim, Plaintiff must allege that "[he] and other individuals who were treated differently were similarly situated in all material respects." *Aldridge v. City of Memphis*, 404 F. App'x 29, 42 (6th Cir. 2010) (quoting *Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009)).

Defendants seek dismissal of this claim, arguing that Plaintiff fails to identify any similarly situated individuals treated differently.  Plaintiff responds that he expressly alleges that similarly situated homeowners were treated differently and "should therefore be left to his proofs."  (MTD Resp. Br. at 18, ECF No. 17 at Pg ID 608.)  He further asserts that "[i]t does not take an overactive imagination to draw the inference from Plaintiff's pleadings that most owner-occupied single-family homeowners in Ann Arbor are not criminally charged, repeatedly, for having roommates."  (*Id.* (emphasis in original).)  *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 555, instruct that Plaintiff's arguments do not save his equal protection claim from dismissal. [6]

Plaintiff has not sufficiently alleged the existence of a comparator.  Instead, in a conclusory manner, Plaintiff merely alleges the existence of unidentified

---

[6] To the extent Plaintiff's claim is premised on criminal charges against him, the claim also is time barred.

similarly situated homeowners.  (*See* Compl. ¶¶ 87, 165, ECF No. 1 at Pg ID 17,

33 (alleging that "Plaintiff was treated differently than similarly situated owners of

'owner-occupied' 'single-family' 'dwellings' in Ann Arbor . . .").)  Such

threadbare allegations fall short of the required factual pleadings to state a claim,

as *Iqbal* and *Twombly* require.  *See Rondigo, LLC v. Twp. of Richmond*, 641 F.3d

673, 683-84 (6th Cir. 2011) (reversing the district court's denial of the defendants'

motion to dismiss the plaintiff's equal protection claim, concluding that "[t]he

district court's contrary ruling is based in part on a failure to apply the Supreme

Court's teaching in *Twombly* and *Iqbal*.  The district court expressly recognized the

applicability of *Twombly*, recognized that legal conclusions not be accepted as true,

and recognized that the complaint must set forth 'some factual basis' for the claims

asserted.  Yet, the court accepted [the] plaintiff's alleged legal conclusions that

[another individual] was similarly situated and that they were treated differently

because of gender-based discrimination without requiring supporting factual

allegations"); *WCI, Inc. v. Ohio Dep't of Public Safety*, 774 F. App'x 959, 964 (6th

Cir. 2019) (describing the plaintiff's "reference to 'other commercial permit

holders who are treated differently'" as "asserting a required legal element of its

[equal protection] claim 'couched as a factual assertion,'" with "no plausible

factual allegations").  Not only does Plaintiff's Complaint lack facts from which to

plausibly draw the inference that other individuals of owner-occupied properties

were treated differently but, perhaps more importantly, the relevant comparators are such individuals who *rent* dwelling units within those properties *without first obtaining a certificate of compliance.*

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's equal protection claim.

### D.   First Amendment Retaliation

Plaintiff alleges that, in retaliation for his opposition to the City's Housing Code enforcement activities, "Defendants . . . subject[ed] him to an ongoing campaign of harassment designed to chill his speech, including, but not limited to, spuriously charging Plaintiff twice with nearly identical criminal charges[,] illegally inspecting his property, and[] continuously preventing and disturbing his quiet enjoyment of his private homes."  (Compl. ¶¶ 171-72, ECF No. 1 at Pg ID 34.)  As discussed above, the statute of limitations bars Plaintiff's claim to the extent it is based on conduct more than three years before he filed this action (i.e., prior to June 9, 2019)  The only retaliatory actions within the limitations period described in Plaintiff's Complaint are the 2022 inspection of the Seventh Street Property and the February 25, 2022 letter in which "Defendants . . . demanded Plaintiff submit to warrantless government inspection . . . or face 'further enforcement action.'"  (*Id*. ¶¶ 103-04, Pg ID 20 (quoting *id.* Ex. 8, ECF No. 1-8).)

To state a First Amendment retaliation claim, Plaintiff must plausibly allege that "(1) he engaged in protected conduct; (2) [Defendants] took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken (at least in part) because of the protected conduct."[7]  *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)) (additional quotation marks omitted).  Further, to assert a violation against any specific defendant, Plaintiff must plead facts of personal involvement.  *Robertson v. Lucas*, 753 F.3d 605, 615 (6th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 676) (explaining that "[a] critical aspect of the § 1983 . . . universe is that to be held liable, a plaintiff must demonstrate 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"); *Binay v. Betterdorf*, 601 F.3d 640, 650 (6th Cir. 2010).  Plaintiff's claim is deficient in several respects.

First, a complaint that categorically refers to " 'Defendants' . . . fail[s] to 'allege, with particularity, facts that demonstrate what *each* defendant did to

---

[7] Defendants point out that a plaintiff claiming retaliatory prosecution must also plead that the prosecution was not supported by probable cause.  (MTD Br. at 15, ECF No. 9 at Pg ID 159 (citing *Harman v. Moore*, 547 U.S. 250, 256 (2006).)  In his Complaint, Plaintiff does not describe *any* prosecutions within the limitations period.

violate the asserted constitutional right.'" *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596-97 (6th Cir. 2012) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)) (emphasis in original); *see also id.* at 596 (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."); *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) ("Summary reference to a single, five-headed 'Defendants' does not support a reasonable inference that each Defendant is liable for retaliation."). With respect to any alleged retaliatory conduct that is not time-barred, the only individual defendant Plaintiff refers to specifically in his Complaint is MacFarland, and that reference relates to the search of the Seventh Street Property on February 17. (*See* Compl. ¶ 103, ECF No. 1 at Pg ID 20.) While Plaintiff alleges only that "Defendants" issued the February 25 letter (*id.* ¶ 104, Pg ID 20), the letter reflects that MacFarland was the author (*id*. Ex. 8, ECF No. 108). It also is clear that Dempsey swore out the affidavit to obtain the administrative warrant for the February 17 search. (MTD Ex. 2, ECF No. 9-3.) Otherwise, as he does consistently throughout the Complaint, Plaintiff repeatedly uses the collective term

"Defendants" or refers to "the City," failing to identify any defendant's personal involvement.  (*See, e.g., id*. ¶¶ 16, 23, 102, 104, ECF No. 1 at Pg ID 5, 7, 20.)

Thus, the Court will analyze Plaintiff's First Amendment retaliation claim as to MacFarland and Dempsey, only.  The remaining defendants are entitled to dismissal with respect to this claim based on Plaintiff's failure to allege their personal involvement.  But even as to MacFarland and Dempsey, Plaintiff's allegations fall short for a related reason.

Plaintiff offers no plausible, non-conclusory facts to show that MacFarland's or Dempsey's conduct was even in part in response to Plaintiff's First Amendment conduct.  (*See, e.g.*, Compl. ¶ 71, ECF No. 1 at Pg ID 15 ("The City *and its agents* at the Rental Housing Services department were on notice of Plaintiff's protected conduct and complaints to the mayor") (emphasis added); *id.* ¶ 109, Pg ID 21 ("Upon information and belief, *Defendants* periodic and ongoing enforcement decisions are based on animus towards Plaintiff, and are in retaliation for Plaintiff's protected speech.") (emphasis added).)  Stated differently, Plaintiff "offers no facts to support a reasonable inference that [MacFarland or Dempsey] took such an [action] . . . in response to [Plaintiff]'s protected speech." *Boxill*, 935 F.3d at 518 (affirming dismissal of the plaintiff's First Amendment retaliation claim where "her claims rest[ed] on broad, conclusory allegations that the 'Defendants' [took action in retaliation to her protected speech]").  This is not a

case where "the sheer number of complaints" by the plaintiff support an inference that his protected activity was known city-wide or where the chronology of events supports an inference of causation. *See Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012) (finding that the many complaints by the plaintiff over a period of years to various members of the mayor's staff supported an inference that the mayor was aware of the plaintiff's speech and finding that the termination of the plaintiff a day after she engaged in protected conduct further supported the claim). Here, Plaintiff alleges only two limited incidents where he exercised his First Amendment rights—one in 2012 and one in 2019—and the alleged retaliatory actions occurred almost two and a half years after Plaintiff's last complaint to the mayor.[8]

Plaintiff nevertheless asserts that "causation is squarely a question of fact for a fact finder and not an appropriate subject of a motion to dismiss." (MTD Resp. Br. at 15, ECF No. 17 at Pg ID 605 (citing *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).) *Bailey* predates *Twombly* and *Iqbal*, however.

---

[8] Plaintiff indicates in his response brief that, "[g]iven leave to amend his Complaint," he could "set forth additional timely factual allegations [of adverse conduct]." (MTD Resp. Br. at 15 n. 8, ECF No. 17 at Pg ID 605.) However, these allegations are likewise far removed in time from his October 2019 complaints to the mayor and therefore do not fill the gap of plausible, non-conclusory facts showing that MacFarland's or Dempsey's conduct was even in part in response to Plaintiff's First Amendment conduct.

More recently, the Sixth Circuit, as well as district courts within this Circuit, have found dismissal of a First Amendment retaliation claim appropriate where the plaintiff failed to plead facts to render a causal connection plausible. *See, e.g., Boxill*, 935 F.3d at 518-19; *Guess v. St. Martinus Univ.*, No. 21-1478, 2022 WL 1224555, at *4 (6th Cir. 2022) (finding that the plaintiff's "allegations fail to establish a plausible causal connection between [his protected conduct] and [the adverse action]"); *Nvarro-Teran v. Embraer Aircraft Maint. Servs., Inc.*, 184 F. Supp. 3d 612, 621-22 (M.D. Tenn. 2016) (finding that the plaintiff did not "plead[] any factual content supporting an inference" of causation).

For these reasons, Plaintiff's First Amendment retaliation claim is subject to dismissal.

### E.    Gross Negligence

A three-year limitations period applies to Plaintiff's gross negligence claim. Mich. Comp. Laws § 600.5805(10).  As such, Plaintiff's claim must be premised on conduct within the three-year period before the filing of his Complaint on June 9, 2022.  In response to Defendants' motion, Plaintiff specifies the conduct on which his gross negligence claim is based: "Defendants M[a]cFarland, Dempsey, and Turner-Tolbert exhibited this willful disregard in February[] 2022 when they issued a letter to Plaintiff demanding that he submit to a warrantless search of his

home or face 'further enforcement action[.]'"  (MTD Resp. Br. at 26, ECF No. 17 at Pg ID 616 (quoting Compl. Ex. 8, ECF No. 1-8).)

Under Michigan law, "gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8).  Plaintiff argues that the question of whether Defendants' conduct constitutes gross negligence is generally a question of fact. (MTD Resp. Br. at 26, ECF No. 17 at Pg ID 616 (citing *Tarlea v. Crabtree*, 687 N.W.2d 333, 338 (Mich. Ct. App. 2004).)  However, the Michigan Court of Appeals also stated in *Tarlea* that if "no reasonable person could find that [the defendant]'s conduct was grossly negligent," the claim should be dismissed.  687 N.W.2d at 338-39; *see also Soper v. Hoben*, 195 F.3d 845, 851 (6th Cir. 1999) (rejecting the assertion that the reasonableness of the defendant's conduct for purposes of a gross negligence claim is always a question of fact for the jury, not the court).  Further, "[e]vidence of ordinary negligence does not create a question of fact regarding gross negligence."  *Xu v. Gay*, 668 N.W.2d 166, 171 (Mich. Ct. App. 2003) (citing *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999)).

Plaintiff does not plead any facts suggesting that Dempsey or Turner-Tolbert played any role in preparing or issuing the February 25 letter.  As indicated previously, the letter is authored by MacFarland.  In any event, contrary to Plaintiff's assertion, the letter does not demand that Plaintiff consent to a

32

warrantless search or face enforcement action.  (*See* Compl. Ex. 8, ECF No. 1-8.)

The letter instead informs Plaintiff that Housing Code violations were found during

the inspection of the home (which was pursuant to an administrative search

warrant), that the property must be registered as a rental, that a certificate of

compliance must be obtained, and that Plaintiff has 60 days to correct the

violations or face further enforcement action.  (*Id.*)  The letter informs Plaintiff of

his right to appeal.  No reasonable person could find gross negligence based on the

issuance of the letter.

### F.     Unjust Enrichment

A plaintiff alleging unjust enrichment in violation of Michigan law must

show: "(1) receipt of a benefit by the defendant from the plaintiff and (2) an

inequity resulting to [the] plaintiff because of the retention of the benefit by [the]

defendant."  *Halpern 2012*, 806 F. App'x at 397 (quoting *Barber v. SMH (US),

Inc.*, 509 N.W.2d 791, 797 (Mich. Ct. App. 1993)).  Like the plaintiff in *Halpern

2012*, *see id.*, Plaintiff alleges that the City collected inspection and permitting fee

assessments to fund unconstitutional searches of his property (Compl. ¶¶ 185-86,

ECF No. 1 at Pg ID 36).  As the Sixth Circuit did in *Halpern 2012*, following what

other district courts did before it, this argument must be rejected.  *Halpern 2012*,

806 F. App'x at 398 (citing *Inv. Realty Servs., LLC v. City of Allen Park*, No. 18-

11476, 2020 WL 230272, at *7 (E.D. Mich. Jan. 15, 2020); *Flynn v. City of*

*Lincoln Park*, No. 18-cv-12187, 2020 WL 344854, at \*11 (E.D. Mich. Jan. 21, 2020)).

The rationale provided by these courts for dismissing the plaintiffs' unjust enrichment claims is best summarized by the district court in *Halpern 2012*:

> Plaintiff cannot establish these elements [to establish an unjust enrichment claim under Michigan law]. In paying lawful registration and inspection fees, Plaintiff does not confer a benefit on Defendant. Nor does an inequity result from the payment of these fees: to rent a property in the city, a landlord must have a certificate of compliance, and these fees must be paid to obtain a certificate. It is the choice of the property owner to pay the required fees but fail to comply with the other requirements for receiving a certificate.
>
> As noted, municipalities possess the authority to regulate land use and set occupancy requirements under their police power. *See 15192 Thirteen Mile Road*, 626 F. Supp. at 823. Furthermore, Plaintiff has not challenged Defendant's authority to institute registration and collection fees, nor has Plaintiff challenged Defendant's authority to prohibit renting properties without a certificate of compliance. And Plaintiff has not established that it actually paid any unconstitutional inspection fees and therefore has not suffered an injury-in-fact with respect to these damage claims.

404 F. Supp. 3d at 1124. As the court also explained, "the lack of pre-compliance review affected only the propriety of the inspection ordinance." *Id.* (quoting *MS Rentals*, 362 F. Supp. 3d at 419). A "[p]laintiff cannot hide behind the Fourth Amendment to avoid paying registration and inspection fees." *Id.*; *see also MS Rentals*, 362 F. Supp. 3d at 418-19 ("Here the lack of precompliance review

affected only the propriety of the inspection ordinance; if the plaintiffs elected to operate without a certificate of compliance and were fined for doing so, they cannot be heard to cry foul. . . . the plaintiffs have no right under the law to avoid inspection and maintain rental property without a certificate."). The district courts in the cited cases found the imposed fees and fines lawfully imposed, and therefore rejected the plaintiffs' unjust enrichment claims, even though the ordinances at issue permitted warrantless searches of rental properties. There is even more reason to reject Plaintiff's unjust enrichment claim in the present case. As found above, the City's Housing Code *does not* authorize warrantless searches.

In short, Plaintiff's unjust enrichment claim also is subject to dismissal.

### G.    Headlee Amendment

Plaintiff alleges that the City's inspection-related fees constitute illegal taxes in violation of Michigan's Headlee Amendment. (Compl. ¶¶ 195-199, ECF No. 1 at Pg ID 38.) This provision of the Michigan Constitution is violated if a local government levies a new tax without voter approval. *See* Mich. Const., art. 9 § 31; *Durant v. Michigan*, 566 N.W.2d 272, 275 (Mich. 1997). "However, if the charge is a user fee, . . . the charge is not affected by the Headlee Amendment." *Bolt v. City of Lansing*, 587 N.W.2d 264, 268 (Mich. 1998).

"There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Id.* at 268. As a general rule, "a 'fee'

is exchanged for a service rendered or a benefit conferred, and some reasonable

relationship exists between the amount of the fee and the value of the service or

benefit." *Id.* at 269 (quotation marks and citations omitted).  In comparison, a tax

"is designed to raise revenue." *Id.* (citation omitted).  Whether a charge is a tax or

user fee is a question of law for the court to decide. *Id.*

  The Michigan Supreme Court has identified three factors that distinguish

user fees from taxes:  (1) "a user fee must serve a regulatory purpose rather than a

revenue-raising purpose," (2) "user fees must be proportionate to the necessary

costs of the service," and (3) user fees contain an element of "voluntariness" in that

"property owners [a]re able to refuse or limit their use of the commodity or

service." *Id.* at 269-70.  The first and second factors are "closely intertwined":

> To be sustained as a regulatory fee, the act must be held
> to be one for regulation only, and not as a means
> primarily of producing revenue.  Such a measure will be
> upheld by the courts when plainly intended as a police
> regulation, and the revenue derived therefrom is not
> disproportionate to the cost of issuing the license, and the
> regulation of the business to which it applies.

*Id.* at 269 (quoting *Vernor v. Sec. of State*, 146 N.W. 338, 341 (Mich. 1914)).

"These criteria are not to be considered in isolation, but rather in their totality, such

that a weakness in one area would not necessarily mandate a finding that the

charge is not a fee." *Wheeler v. Charter Twp. of Shelby*, 697 N.W.2d 180, 186

(Mich. Ct. App. 2005) (quoting *Graham v. Kochville Twp.*, 599 N.W.2d 793, 799

(Mich. Ct. App. 1999)); *see also Bolt*, 587 N.W.2d at 272 n. 16.

As an initial matter, a one-year limitations period applies to Plaintiff's

Headlee Amendment claim to the extent he seeks damages for past wrongs. *See*

Mich. Comp. Laws § 600.308a(3).  As Plaintiff correctly points out, the statute of

limitations does not prevent the Court from enjoining the City from imposing

future taxes on him that violate the Headlee Amendment or declaring certain fees

unconstitutional. *See Taxpayers Allied for Constitutional Taxation v. Wayne Cnty.*,

537 N.W.2d 596, 600-01 (Mich. 1995).

In his Complaint, Plaintiff does not allege that he was charged or paid any

inspection fees within the limitations period (i.e., within a year of June 9, 2022).

(*See generally* Compl., ECF No. 1.)  In his response brief, Plaintiff asserts that the

list of Rental Housing Inspection Fees attached to his Complaint reflects that the

fee for the February 17, 2022 inspection was $90.[9]  (MTD Resp. Br. at 29, ECF

No. 17 at Pg ID 619 (citing Compl. Ex. 3, ECF No. 1-3).)  Plaintiff also notes that

Defendants cancelled a June 2022 inspection of his property and, pursuant to the

---

[9] The list of Rental Housing Inspection Fees provided by Plaintiff, however, lists
an effective date of March 24, 2022, after the inspection.  (*See* Compl. Ex. 3, ECF
No. 1-3.)

fee list, there is a $50 cancellation fee.[10]  (*Id.*)  But neither proposed new "fact"

reflects that Plaintiff actually paid or has been charged any inspection fee within

the limitations period.  As such, the Court concludes that Plaintiff fails to state a

claim for damages with respect to his Headlee Amendment claim.  Nevertheless, as

indicated above, the statute of limitations does not bar Plaintiff from obtaining a

declaratory judgment or injunctive relief *if* the fees violate the Headlee

Amendment.

The Housing Law of Michigan, Michigan Compiled Laws § 125.401 *et seq.*,

grants enforcing agencies in municipalities with populations of 10,000 or more

with authority to inspect dwellings.  Mich. Comp. Laws § 125.526.  The statute

authorizes municipalities to charge "a reasonable fee" for such inspections.  *Id.*

§ 125.526(16).  More specifically, the statute states that "[t]he fee shall not exceed

the actual, reasonable cost of providing the inspection for which the fee is

charged."  *Id.*  The statute provides a mechanism for individuals to request a report

from a municipality in order to compare the fees collected by the municipality with

the expenses of its inspection program.  *Id.* § 125.526(17).  The municipality must

provide the report within 90 days after a request is made.  *Id.*

---

[10] The Court has doubts as to whether a cancellation fee is imposed where the City, as opposed to the property owner, cancels the inspection.

To support his claim that the City's inspection fees violate the Headlee Amendment, Plaintiff alleges only that "[t]hese 'fees' constitute a revenue-raising device for the Defendant City of Ann Arbor above and beyond any administrative costs necessary for the . . . certificate of compliance."  (Compl. ¶ 198, ECF No. 38.)  Plaintiff fails to allege factual support for his legal conclusions.  In any event, the relevant considerations reflect that the fees are not taxes subject to the Headlee Amendment.

First, the inspection fees undoubtedly serve a regulatory purpose, as a number of courts have found.  *Halpern 2012*, 806 F. App'x at 395 (citing *Harris v. Akron Dep't of Public Health*, 10 F. App'x 316, 319-20 (6th Cir. 2001)) ("Center Line's rental-property registration and inspection requirements are reasonable means of advancing its governmental interests in public safety and welfare, and it may impose reasonable fees to offset the costs of advancing those interests.").  Second, no allegations suggest that the inspection fees are disproportionate to the cost of inspecting rental properties and regulating the habitability of those properties.  And on their face the fees clearly are reasonable. [11]  *See Kircher v. City*

---

[11] Moreover, judicial review of municipal-utility rates is constrained, and "[c]ourts generally afford great deference to municipal-ratemaking authorities."  *See Shaw v. City of Dearborn*, 944 N.W.2d 153, 163 (Mich. Ct. App. 2019) (citing *Novi v. Detroit*, 446 N.W.2d 118, 123 (Mich. 1989)).  As a long-recognized principle, "municipal utility rates are presumptively reasonable."  *Id.* (citing *Trahey v.*

*of Ypsilanti*, 712 N.W.2d 738, 744 (Mich. Ct. App. 2005) (holding that municipal fees are presumed reasonable unless 'wholly out of proportion to the expense involved").

Third, the fees are voluntary in that "property owners [a]re able to refuse or limit their use of the commodity or service." *Bolt*, 587 N.W.2d 269-70. As the Michigan Court of Appeals reasoned in *Waterchase Associates, LLC v. City of Wyoming*, No. 225209, 2001 WL 1011889 (Sept. 4, 2001), "the fees [a]re not imposed on all property owners within [the City's] boundaries, as was the service charge rejected as an unconstitutional tax in *Bolt* . . . but were imposed only on those parties who cho[o]se to own . . . rental units." *Id*. at *1.

Finally, and significantly given there is no bright-line test for distinguishing valid user fees from taxes, the City's inspection fees are not akin to the charges which have been found to be a disguised tax for purposes of the Headlee Amendment. For example, in *Bolt*, the Michigan Supreme Court found that

---

*Inkster*, 876 N.W.2d 582 (Mich. Ct. App. 2015)). "A fee charged by a municipality is 'presumed reasonable unless it is facially or evidently so wholly out of proportion to the expense involved that it must be held to be a mere guise or subterfuge to obtain the increased revenue.'" *Id.* (quoting *Kircher v. Ypsilanti*, 712 N.W.2d 738, 744 (Mich. Ct. App. 2005)). As the Michigan courts reason: "[R]ate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates." *Id.* (quoting *Novi*, 446 N.W.2d at 124). "Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." *Id.* (quoting *Novi*, 446 N.W.2d at 125-26).

Lansing violated the Headlee Amendment when it imposed a charge on each parcel of real property to finance the $176 million dollar cost to create a stormwater system. 587 N.W.2d at 270; *see also Jackson Cnty. v. City of Jackson*, 836 N.W.2d 903 (Mich. Ct. App. 2013) (concluding that the Headlee Amendment was violated when the City of Jackson imposed a storm water management charge on all property owners within the city to generate revenue to pay for the services provided by a newly created storm water utility). In comparison, the district court in *Kochis v. City of Westland*, 409 F. Supp. 3d 598 (E.D. Mich. 2019), found that the city's fees under its debris removal and nuisance ordinances were not designed to raise revenue and, therefore, not subject to the Headlee Amendment. *Id.* at 610-11; *see also Wheeler*, 697 N.W.2d at 186-87 (reversing trial court's holding that a collection and disposal fee implicates the Headlee Amendment). In *Mapleview Estates, Inc. v. City of Brown City*, 671 N.W.2d 572 (Mich. Ct. App. 2003), the state appellate court found the fees the city charged for connecting new homes to the city's central water supply and sewer systems were user fees, not subject to the Headlee Amendment. *Id.* at 575-76. And in *Cordts v. Griffis*, No. 18-13017, 2020 WL 1274966, at *14 (E.D. Mich. Mar. 16, 2020), the district court found that Huron Township did not illegally add a 25% administrative charge to fees billed by the city when a property owner neglected to cut the grass and the city arranged for the work to be done by contractors. The two cases this Court located addressing

41

rental inspection charges, specifically, found them to be fees, not taxes.  *See Waterchase*, 2001 WL 1011889, at *1; *Northgate Towers Assoc. v. Charter Twp. of Royal Oak*, 543 N.W.2d 351, 353 (Mich. Ct. App. 1995), *vacated in part on other grounds*, 557 N.W.2d 312 (Mich. 1996).

For these reasons, the Court is granting Defendants' motion to dismiss Plaintiff's Headlee Amendment claim.

## V.   Conclusion

In summary, the Court concludes that Plaintiff's Complaint is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  As Plaintiff fails to state a claim upon which relief may be granted, particularly with respect to his Fourth Amendment claim on which his motion for preliminary injunction is based, the Court denies his request for a preliminary injunction.  *See Gonzales*, 223 F.3d at 625 (explaining that "a finding that there is simply no likelihood of success on the merits is usually fatal [to a motion seeking a preliminary injunction]").

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (ECF No. 9) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for preliminary

injunction and expedited consideration (ECF No. 10) is **DENIED**.


                                          s/ Linda V. Parker
                                          LINDA  V. PARKER
                                          U.S. DISTRICT JUDGE

Dated: February 27, 2023